[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision
Stella Piotrowski died on October 22, 1991. She left behind a modest estate, a trio of warring children, and a pair of attorneys soon retained by different factions of those children. Within weeks, the attorneys for the heirs became co-administrators of the estate. The result has been a modern version ofBleak House. Almost five years after Ms. Piotrowski's death her estate has yet to close. The attorneys have demanded fees that are grossly excessive by any appropriate standard. Dissatisfied with the Probate Court's award of fees, the attorneys have now brought this appeal from probate, pursuant to Conn. Gen. Stat. § 45a-186, asking this court to make an independent assessment of reasonable fees. I make such an assessment below.
The standard of review applicable to this appeal is established by Andrews v. Gorby, 237 Conn. 12 (1996). No record was made before the Probate Court. A trial de novo is accordingly required. Id. at 16. Such a trial has now been held. I must now reach "an independent determination, without regard to the result reached by the probate court." Id (Internal quotation marks and citation omitted.) In an effort to make "an independent assessment of the facts," id. at 17, I have neither seen nor considered the decision of the Probate Court appealed from. The following facts are found based on the evidence submitted by the parties and the Probate Court file (stripped of the decision CT Page 4790 appealed from) transmitted by the Probate Court.
Stella Piotrowski, as mentioned, died on October 22, 1991. She was a 97 year old widow and died intestate. She was survived by three grown children: John and Edward Piotrowski and Helen Toretto. (To avoid confusion, Ms. Piotrowski and her children will be referred to by their first names.) At the time of Stella's death, Helen was a widow in her early 70's. The ages of John and Edward are not in evidence. Edward died on January 17, 1996, prior to the trial, and his executrix has been substituted as a party in his place.
Stella left a modest estate. Her principal asset was a four unit apartment house in Bristol. One unit was occupied by Helen. Stella had herself lived in this house for many years prior to her death. The house was valued at $215,000 in the probate inventory, but the evidence makes it clear that this value is excessive. The house failed to sell on the open market, and it was ultimately sold in 1993 to John and Edward for $165,000. Under the circumstances, this latter price can fairly be considered the fair market value of the property. Stella also left cash and bank accounts totalling $68,760. Her inventory finally lists nine items of miscellaneous personal property valued at a total of $300. Suitably adjusted for the actual fair market value of the house, her estate thus had a gross value of approximately $234,000.
Stella's children were divided into two factions at the time of her death. John and Edward were on one side, and Helen was on the other. Each faction retained its own attorney at an early date. The attorneys so retained are the plaintiffs in the present appeal. Their initial roles in this drama must be separately described.
Attorney Daniel Tully ("Tully") was retained by John and Edward prior to Stella's death. He was initially retained to file an application in the Bristol Probate Court to have a temporary conservator appointed for Stella. Stella and Helen, as mentioned, lived in the same house, and John and Edward wanted to displace Helen as Stella's de facto caretaker. Stella died before the application could be heard.
Following Stella's death, Tully represented John and Edward in their capacity as heirs. Tully prepared an application requesting the appointment of a temporary administrator of CT Page 4791 Stella's estate. This application was signed by John and filed in the Bristol Probate Court on October 29, 1991. On November 1, 1991, John filed an application requesting that letters of administration be granted to him as fiduciary. His application names Tully as his attorney. Tully never filed a formal appearance.
Attorney Alfred F. Morrocco, Jr. ("Morrocco") was retained by Helen's children to represent Helen shortly after Stella's death. Helen had herself collapsed the day after her mother's death and was hospitalized in a coma. On October 31, 1991, the Probate Court appointed Attorney James Donovan as her guardian ad litem. Shortly afterwards, Helen's three children retained Morrocco to represent Helen. They gave him a retainer of $2,000. The terms of Morrocco's representation were not made clear. There was no written retainer agreement. Morrocco, at least initially, represented Helen in two different endeavors. The first endeavor was to have Attorney Donovan removed as her guardian ad litem. This task was successfully completed on November 21, 1991, after Helen had been released from the hospital, when Attorney Donovan resigned his position. The second endeavor was the representation of Helen in her capacity as heir to the estate. On November 8, 1991, Morrocco filed an appearance for Helen in the Probate Court in the probate case involving Stella's estate.
John's application for letters of administration was heard by the Probate Court on November 13, 1991. The hearing was attended by Morrocco, Tully, John, Edward, and at least one member of Helen's family. Helen, who was still in poor health, was not present. Morrocco suggested that he and Tully be appointed co-administrators. Those present agreed, and the Probate Court agreed as well. Morrocco and Tully were appointed as co-administrators on November 20, 1991.
Morrocco and Tully now claim compensation for their work as co-administrators and as attorneys for the estate. The period for which they claim compensation begins on November 13 1991, when the Probate Court orally indicated that it would appoint them as co-administrators. It ends on September 9, 1993, when they filed their second final accounting. The Probate Court's ruling on this latter document is the ruling appealed from here. (Morrocco and Tully do not claim fees for any service performed after September 9, 1993.) In this document, Morrocco and Tully each claim $7,500 in administrator's fees and $6,000 in attorney's fees, for a total of $13,500 each and a grand total of $27,000. At trial, CT Page 4792 Morrocco still claimed $13,500. Tully, however, increased his claim to $17,000. Together the two attorneys thus now claim fees of $30,500. These fees are grossly excessive.
The attorneys justify their claim by their hours. Tully claims to have spent 168 billable hours on the case, at rates of $100 to $125 an hour. Morrocco, a more experienced attorney, claims to have spent 143 billable hours on the case, at the rate of $150 an hour. (On its face, this calculus would justify a fee of over $21,000, but Morrocco, as mentioned, limits his claim to $13,500.) Together Morrocco and Tully thus claim to have devoted 311 billable hours to this case. Andrews v. Gorby, supra, makes it clear that "the burden rests on the attorney[s] to prove the reasonableness of the compensation requested by a preponderance of the evidence." 237 Conn. at 23. (Footnote omitted.) Morrocco and Tully have not satisfied this burden of proof. Their claims are undermined by several different factual and legal problems.
First. The evidence makes it unclear which hats Morrocco and Tully were wearing when they billed the hours in question. The problem is that they were for a substantial period of time both co-administrators and attorneys for the heirs. Morrocco filed an appearance for Helen on November 8, 1991, and never withdrew it. New counsel did not appear for Helen until October 5, 1992 and this appearance was not an "in lieu of" appearance. Tully, as mentioned, never filed an appearance, but, in late October and early November 1991, he prepared documents stating that he was the attorney for John. New counsel did not appear for John until December 8, 1992. At least during their first year as co-administrators, Morrocco and Tully primarily dealt with their original clients. Tully primarily dealt with John and Edward. Morrocco primarily dealt with Helen. The billing records of each attorney repeatedly refer to meetings with "clients." The "clients" so mentioned are the heirs originally represented by that attorney. In addition, the evidence establishes that Morrocco continued for some time to advise Helen in the fashion that an attorney advises a client. In a letter dated April 10, 1992 (Ex. 5), Morrocco advised Helen to file a claim against the estate and specifically stated that "I believe a justified figure [for the claim] would be $50,000.00 to $60,000.00." This is not the language of an administrator of an estate. Rather, it is the language of an attorney advising a client.
Second. The hours billed are excessive by any standard. The evidence reveals that Morrocco and Tully performed the following CT Page 4793 tasks in their capacity as co-administrators during the period in question.
(a) On December 9, 1991, they filed a certificate of notice for land records.
(b) On April 21, 1992, they filed the inventory of the estate. This document consists of two pages (not counting an attached copy of a deed) and lists six inventory items, one of which is "miscellaneous personal property." The "miscellaneous personal property" is further broken down into nine items. As mentioned these nine items were valued at a total of $300. Morrocco and Tully testified that they spent prodigious hours itemizing and valuing personal property. This testimony cannot be reconciled with the inventory they prepared.
(c) On June 23, 1992, they signed a Form S-1 (Ex. 18). This document does not suggest any particular difficulties in its preparation. There was no audit by the Department of Revenue Services.
(d) On June 25, 1992, they filed a return of claims. This is a one-page document listing nine claims.
(e) On September 1, 1992, they denied a claim filed by Helen (this is one of the claims listed in the return of claims), who had acted on advice given to her by Morrocco in the letter already mentioned. This denial is stated in a brief business letter. Morrocco and Tully obtained the advice of outside counsel prior to issuing this denial, but that counsel has been separately compensated by the estate.
(f) On November 17, 1992, they filed their first final accounting. This document was later superseded by a second final accounting (discussed below) and was never acted upon by the Probate Court.
(g) On December 29, 1992, Tully spent three hours preparing for and attending a commissioners' hearing on Helen's appeal from the co-administrators' denial of their claim. Morrocco's time sheets do not show attendance on his part.
(h) On January 26, 1993, Tully spent an undeterminable portion of a three hour billing period attending a second and final session of the commissioners' hearing. His time sheets do CT Page 4794 not show the time actually devoted to attending the hearing. Morrocco's time sheets fail to show attendance at the hearing at all.
(i) On April 20, 1993, they filed an application to sell real property. The property in question was Stella's house. Morrocco and Tully devoted some time to negotiating the price of the property. They rejected an initial offer from John and Edward of $141,000 as too low and eventually, as mentioned, settled on a price $165,000. Morrocco and Tully did not, however, actually sell the real property. That is because on June 17, 1993, the Probate Court removed them as coadministrators. Attorney Mark Ziogas was appointed administrator in their place, and he sold the house and filed the return of sale. On July 7, 1993, Morrocco and Tully were reinstated as coadministrators.
(j) On September 9, 1993, they filed a second final accounting. The denial of this document by the Probate Court has resulted in the present appeal.
(k) From December 9, 1991, to July 28, 1993, they wrote a total of 56 checks to outside creditors. They also wrote numerous checks to themselves. Morrocco and Tully testified at the hearing that the checks they had written to themselves totalled $20,000. They represented that they would return any funds in excess of the compensation approved by this court.
(l) From the time of their initial appointment to the time of their removal as co-administrators on June 17, 1993, they spent some time dealing with three tenants of the apartment house. The second final accounting shows $3,000 collected from one tenant to June 1992; $9,000 collected from a second tenant to June 1993; and $1,800 collected from a third tenant to April 1992. In addition, they dealt in some fashion with a squatter, although there is no record of actual eviction proceedings. The evidence does not allow me to make a reliable finding as to the time devoted to tenant matters.
In addition to these tasks, Morrocco and Tully spent a great deal of time dealing with their "clients" and with each other. I cannot find, by a preponderance of the evidence, that they were consistently wearing their co-administrators' hats while doing so.
Third. While Morrocco and Tully claim separate compensation CT Page 4795 in their respective capacities as co-administrators and as attorneys for the estate, they have provided the court no basis to divide their compensation between these two categories. Neither attorney differentiates between these categories in terms of either hours billed or billing rate. Instead, each requests a lump sum for acting in both capacities. It is clear, however, that each attorney did some work in each capacity. Under these circumstances, I have chosen to divide their reasonable compensation into equal shares, awarding half as administrators' fees and half as attorneys' fees. Morrocco and Tully do not oppose this procedure.
Finally. "Time spent is but one factor in determining the reasonableness of an attorney's fee." Andrews v. Gorby, supra,237 Conn. at 24. Under our law, the reasonable compensation to be awarded by the court is "what is fair in view of the size of the estate, the responsibilities involved, the character of the work required, the special problems and difficulties met in doing the work, the results achieved, the knowledge, skill and judgment required of and used by the executors, the manner and promptitude in which the estate has been settled and the time and service required, and any other circumstances which may appear in the case and are relevant and material to this determination."Hayward v. Plant, 98 Conn. 374, 385, 119 A. 341 (1923). AccordAndrews v. Gorby, supra, 237 Conn. at 22-23 n. 17.
I have considered all of the Hayward factors in determining the reasonable compensation to be awarded. I have also considered the somewhat similar American Bar Association standards noted inAndrews v. Gorby, supra, 237 Conn. at 24-25 n. 19. This was a modest estate, the gross value of which was, as mentioned, $234,000, after adjustment for the fair market value of the house. There is no evidence of problems with creditors. No extraordinary legal work was required. The heirs were difficult to deal with, and I have considered this fact in determining my award. On the other hand, as has already been discussed, Morrocco and Tully used poor judgment in dealing with the heirs since they billed excessive hours and did not expressly separate their services to the estate and their services to the heirs. The estate has not been settled promptly.
Having considered all of these factors, I have come to the conclusion that a fair and reasonable total compensation for the two attorneys is $8,000. This shall be broken down as follows. Morrocco shall receive $2,000 in administrator's fees and $2,000 CT Page 4796 in attorney's fees, for a total fee of $4,000. Tully shall receive $2,000 in administrator's fees and $2,000 in attorney's fees, for a total fee of $4,000. Morrocco and Tully are ordered to return to the estate all funds in excess of this amount that they have previously received as compensation for their services as co-administrators and as attorneys for the estate.
The appeal is sustained. No costs are awarded.
Blue, J.